UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| JIMMY L. CHILTON, | } |
| | } |
| Plaintiff, | } |
| | } |
| v. | }   CASE NO.: 2:05-CV-0217-RDP |
| | } |
| HARTFORD LIFE AND ACCIDENT | } |
| INSURANCE COMPANY, | } |
| | } |
| Defendant. | } |

## MEMORANDUM OPINION

**I.   INTRODUCTION**

Pending before the court are Defendant Hartford Life and Accident Insurance Company's ("Hartford") Motion for Summary Judgment (Doc. #17) filed on March 28, 2006, and Motion to Strike Exhibit 1 Submitted in Support of Plaintiff's Response to Hartford's Motion for Summary Judgment ("Motion to Strike") (Doc. #22) filed on May 4, 2006. Plaintiff filed his Complaint on February 1, 2005, seeking disability insurance benefits pursuant to a long-term disability insurance policy under an Employee Retirement Income Security Act of 1974 or "ERISA"-governed plan. (Doc. #1). In addressing Defendant's summary judgment motion, this court must determine which standard of review applies and decide whether Plaintiff is entitled to ERISA benefits. As discussed more fully below, the court finds that there are no material factual disputes and that Hartford is entitled to judgment as a matter of law on its denial of Plaintiff's ERISA benefits claim. Accordingly, Hartford's Motion for Summary Judgment is due to be granted.

## II.     STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *See id.* at 323. Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991) (en banc)). If the moving party bears the burden of proof at trial, then it can only meet its initial

burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial. *See Fitzpatrick*, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires that the movant point out to the district court that there is an absence of evidence to support the non-moving party's case. *See Fitzpatrick*, 2 F.3d at 1115-16. If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the non-movant can no longer rest

on mere allegations, but must set forth evidence of specific facts. *See Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

### III.  STATEMENT OF FACTS[1]

####   A.  Hartford's Long-Term Disability Policy

Hartford issued a group long-term disability policy, GLT-044319 (the "Policy") to Walter Industries, Inc. and Subsidiaries, to insure the long-term disability component of the employee welfare benefit plan (the "Plan") established and maintained by Jim Walter Resources ("Jim Walter"), Plaintiff's former employer. (Doc. #19 at Ex. A (Welch Aff.) ¶ 3 and Ex. 2 (Policy) thereto). "Total Disability" for purposes of Plaintiff's eligibility for disability benefits is defined in the Policy as follows:

> Total Disability or Totally Disabled means that:
>
> (1) during the Elimination Period; and
> (2) for the next 24 months, you are prevented by:
>    (a)   accidental bodily injury;
>    (b)   sickness;
>    (c)   mental illness;
>    (d)   substance abuse; or
>    (e)   pregnancy,
>
> from performing the essential duties of your occupation, and as a result you are earning less than 20% of your Pre-disability earnings … After that, you must be so prevented from performing the essential duties of any occupation for which you are qualified by education, training or experience.

(Policy at 8).

---

[1] The court notes that Plaintiff has offered his own statement of facts without directly responding to those outlined by Hartford. The following statement of facts is based upon a review and comparison of the facts included in Doc. #18, Doc. #20, and Doc. #21 as well as the evidentiary record on summary judgment.

As used in this Policy, the terms "your (own) occupation" and "any occupation" are defined. "Your (own) occupation" means "your occupation as it is recognized in the general workplace. Your (own) occupation does not mean the specific job you are performing for a specific employer or at a specific location." In contrast, "any occupation" as used in this Policy means an occupation:

>    (1)   for which you are qualified by education, training or experience; and
>    (2)   that has an earnings potential greater than an amount equal to the product of your Indexed Pre-disability Earnings and the Benefit Percentage.

(Policy at 5, 8). Regarding termination of benefits, the Policy states in relevant part:

> We will cease benefit payment on the first to occur of:
>
>    (1)   the date you are not longer Disabled;
>    (2)   the date you fail to furnish proof, when requested by us, that you continue to be Disabled;
>    (3)   the date you are no longer under the Regular Care of a Physician, or refuse to be examined by a Physician, if we require such an examination;
>    (4)   the date you die;
>    (5)   the last day of the month following the date determined from the Maximum Duration of Benefits Table shown in the Schedule of Insurance; or
>    (6)   the date your Current Monthly Earnings exceed 80% of your Indexed Pre-disability Earnings.

(Policy at 14).

### B. Plaintiff's Long-Term Disability Claim

#### 1. Initial Claim Proceedings

Plaintiff Jimmy Chilton was employed by Jim Walter as a Section Foreman when his employment was terminated on May 22, 2000. (Doc. #19 at Ex. A at Ex.1 at 00483). Plaintiff contacted Hartford on July 21, 2001, through his employer and submitted a claim for long-term disability benefits for "severe back pain." (Doc. #19 at Ex. A at Ex. 1 at 00486, 00514).

Plaintiff indicated that on November 29, 1999, he had suffered an on-the-job back injury when he stepped over a cable and fell. He received workers' compensation for this injury for a period of time with payments ceasing April 18, 2001. (*Id.* at 00483, 00486- 87).

Dr. Pirofsky, D.O., completed an Attending Physician's Statement of Disability, listing Plaintiff's primary diagnosis as lumbar radiculopathy and indicating Plaintiff should not lift more than 50 lbs. and should limit stooping and bending. Dr. Pirofsky referred to a December 1999 MRI demonstrating a disc bulge. (*Id.* at 00489-90). On a form submitted with his application, Plaintiff acknowledged that his condition was being treated solely with medication and surgery was not an option for him at that time. Plaintiff also had indicated he would be interested in rehabilitation. (*Id.* at 00493).

Plaintiff admitted on a Claimant Questionnaire that he did not require any assistance with any of his daily activities and stated he continued to engage in several of his hobbies, including fishing twice a month and hunting two or three times a month during deer season. He did state he had stopped coaching since the onset of his alleged disability. (*Id.* at 00474).

Hartford awarded Plaintiff long-term disability benefits by letter dated September 17, 2001 with a benefits effective date of November 23, 2000. In this letter, Hartford quoted the Policy's definition of "total disability" and emphasized that after benefits had been payable for 24 months, Plaintiff must be prevented from performing the essential duties of any occupation for which he is qualified by education, training or experience to continue receiving benefits. (*Id.* at 00406-07). On May 29, 2002, Plaintiff was notified that his initial 24 month benefit payment period was beginning to expire, and that Hartford would soon be commencing an investigation to determine if he would qualify for benefits on and after November 23, 2002. (*Id.* at 00389-90).

A vocational interview and analysis were conducted by Hartford revealing Plaintiff was a high school graduate and had worked for Jim Walter in the mining industry for approximately 21 years with prior experience changing tires on heavy equipment. (*Id.* at 00386-87). Plaintiff acknowledged at this time that he still engaged in fishing and hunting and that his current medical condition was "chronic back pain" with "limited lifting, bending and stooping." (*Id.* at 00382).

Plaintiff's Attending Physician's Statement of Continued Disability, completed by Dr. Hankins, D.O. with Dr. Pirofsky's clinic in July 2002, mirrors the statement previously submitted on his behalf. The same December 1999 MRI is the only test result identified. Plaintiff's primary diagnosis was chronic lumbar spine pain. Plaintiff was seen on a monthly basis for chronic pain medication management, but no surgery was performed, no hospitalizations occurred, and Plaintiff had not been referred to any other physicians. (*Id.* at 00378-79). The Attending Physician's Statement also listed the same limitations as before -- no lifting of more than 50 lbs. and limited stooping and bending. (*Id.* at 00379).

A Nurse Case Manager with Hartford followed up with Dr. Hankins and asked him to clarify what he meant by "limited stooping and bending." Dr. Hankins responded that Plaintiff should not engage in "repetitive or continuous stooping or bending." (*Id.* at 00362).

In addition to collecting and reviewing Plaintiff's medical records, a rehabilitative clinical case manager for Hartford completed an "occupational analysis" in October 2002 in order to analyze the occupational descriptions of "Section Supervisor" in the mining industry provided by the Dictionary of Occupational Titles ("DOT"). The occupation was described as a medium-level job

requiring only occasional stooping, kneeling and crouching, and no crawling. The occupation also only occasionally required lifting and carrying between 20 and 50 pounds. (*Id.* at 00363-66).

Hartford informed Plaintiff by letter dated November 22, 2002, that his long-term disability benefits had been terminated. The letter details Hartford's investigation of Plaintiff's claim and summarizes its findings that "the information currently in the claim file does not support [Plaintiff's] continued disability" as the restrictions and limitation provided by Plaintiff's treating physicians did not preclude him from performing the essential duties of his occupation of Section Foreman as defined in the national economy. (*Id.* at 00353-54).

### 2. Appellate Proceedings

On April 21, 2003, Plaintiff's attorney, Roger Fuston, appealed Plaintiff's claim. (*Id.* at 00182). By letter dated May 21, 2003, Plaintiff's attorney submitted medical and other support for Plaintiff's appeal including (1) a vocational rehabilitation assessment report; (2) a clinical assessment of pain; (3) a follow-up evaluation by Dr. Pirofsky; (4) a physical therapy discharge summary; (5) a favorable decision from the Social Security Administration; and (6) a list of medication and dosage prescribed by Dr. Hankins. (*Id.* at 00148-49). Plaintiff's attorney also listed a functional capacity evaluation ("FCE") in support for his appeal; however, no results were provided to Hartford. The FCE is referenced in the vocational rehabilitation report which states that an FCE was conducted in September 2000, at which time Plaintiff tested at the medium work level. The FCE examiner recommended a full range of light and lower range of medium work classifications based on Plaintiff's subjective complaints of pain and his pain medication. Also, according to the examiner, Plaintiff may not be able to perform daily work without the assistance of pain medication. (*Id.* at 00153).

The vocational assessment performed in November 2000 revealed that Plaintiff was released to return to medium physical demand level work in May 2000 with the previously noted restrictions and limitations of no lifting greater than 50 pounds and no repetitive squatting or bending. The vocational assessment indicated Plaintiff would encounter a 50% vocational loss; however, based on the above-noted FCE results, the assessment concluded that Plaintiff is 100% vocationally disabled. (*Id.* at 00151-54).

The clinical assessment of pain completed by one of Plaintiff's treating physicians, Dr. Hankins, in June 2002 reveals that although Plaintiff suffers from distracting pain, his pain medication only results in mildly troublesome side effects that should not adversely affect Plaintiff's ability to perform his previous work activities. Lastly, Dr. Hankins indicated that Plaintiff's level of pain may be less intense or less frequent in the future although it would still remain a significant element in his life. (*Id.* at 00157-58).

Medical records provided by Dr. Pirosky show that, in May 2000, Plaintiff was considered overweight at 260 pounds. At this time, he was issued a 5% impairment rating and returned to work with restrictions of 50 pounds and limited stooping and bending. Plaintiff was only asked to return to the clinic on an as-needed basis. (*Id.* at 00159-60). The physical therapist at Dr. Pirofsky's clinic also discharged Plaintiff from his therapy program on May 19, 2000, stating that he has been involved in a full day strengthening/conditioning program and had demonstrated a plateau in his functional abilities. The physical therapist concluded that, in his professional opinion, "Mr. Chilton currently demonstrates the ability to perform in the medium work category as defined by The Dictionary of Occupational Titles." (*Id.* at 00161).

The following medical records were considered in the Administrative Law Judge's Social Security decision: Emergency Room Records from DCH Regional Medical Center, a December 1999 MRI of the lumbar spine, Emergency/Outpatient Records from Baptist Medical Center Princeton, office notes from Dr. Robert Craddock, medical records from Carraway Occupational Medicine, treatment notes from Dr. Pirofsky, a consultative examination from Dr. Wiley Livingston and a Residual Functional Capacity Assessment completed by a Disability Determination Service physician. (*Id.* at 00170).

Another employability analysis was conducted by Hartford during the appeal which identified Plaintiff's restrictions and limitations and indexed earning potential requirement. (*Id.* at 00144-45). Plaintiff's indexed pre-disability earnings required his monthly salary to be $3604.42 or $43,253.06 annually. (*Id.* at 00140-41). The employability analysis report issued June 26, 2003, concluded that Plaintiff possessed the residual capacity and transferable skills to perform five different occupations. One of those occupations was his own occupation of Section Supervisor. The other four were Core Drilling Supervisor, Quarry Supervisor, Dredge Operator Supervisor, and Pit Supervisor. These identified occupations ranged from light to medium levels of physical exertion and include four occupations in the mining and quarrying industry, the industry in which Plaintiff had worked for 21 years. Also, all occupations exceeded the indexed required earning potential and were determined to be prevalent in the national economy. (*Id.* at 00120-38).

By letter dated June 30, 2003, Plaintiff was informed that the decision to terminate his long-term disability benefits was upheld on appeal. The letter stated that Dr. Hankins' October 25, 2002 work release represented the most current medical work restrictions and limitations provided to Hartford. The letter also explained the employability analysis conducted by Hartford which

determined Plaintiff could perform four light to medium level alternative occupations in addition to his own occupation. (*Id.* at 00118-19). Additionally, the letter stated that this appeal review represented Hartford's final determination and that Plaintiff's claim was closed. (*Id.* at 00119).

Almost one year later, on June 22, 2004, Plaintiff's attorney submitted additional documentation from Dr. Hankins–a February 2004 FCE indicating Plaintiff could sit for a total of six hours during an eight-hour day and stand or walk for two hours. The other restrictions and limitations provided were consistent with Dr. Hankins' earlier opinions. (*Id.* at 00090-91). Hartford responded to Plaintiff's attorney and informed him in writing that the administrative record for this claim was closed on June 30, 2003, and thus they would not respond to any further request for review or reconsideration. (*Id.* at 00087).

IV.     **ANALYSIS**

    A.     **ERISA Standard of Review**[2]

Both Hartford and Plaintiff agree that this court should apply the heightened or modified arbitrary and capricious standard of review to the decision to deny disability benefits. (Doc. #18 at 16-17; Doc. #20 at 4). The modified arbitrary and capricious standard of review is designed to account for the possible conflict of interest on the part of the plan fiduciary that both insures and determines claims under a plan. *See Brown v. Blue Cross and Blue Shield of Ala.*, 898 F.2d 1556, 1563 (11th Cir. 1990) (explaining heightened arbitrary and capricious standard of review), *cert. denied*, 498 U.S. 1040 (1991).

---

[2]Because the court's role in ERISA cases is more akin to an appellate one, the scope of its review on summary judgment is notably different than when it sits as a trial court. *See Providence v. Hartford Life & Accident Ins. Co.*, 357 F. Supp. 2d 1341, 1342 n.1 (M.D. Fla.2005) ("[T]he Court's task is to review the benefit decision based on the administrative record available to the decision maker at the time he or she made the decision.").

In *Williams v. BellSouth Telecomms., Inc.*, 373 F.3d 1132, 1138 (11th Cir. 2004), the Eleventh Circuit set forth a six-step model for use in judicially reviewing virtually all ERISA denials:

> (1)   Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (*i.e.*, the court disagrees with the administrator's decision; if it is not, then end the inquiry and affirm the decision).
>
> (2)   If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
>
> (3)   If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
>
> (4)   If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
>
> (5)   If there is no conflict, then end the inquiry and affirm the decision.
>
> (6)   If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

*Williams*, 373 F.3d at 1138 (footnotes omitted). Therefore, the first step of analysis under the modified arbitrary and capricious standard of review, is to determine from a *de novo* perspective, whether the benefits determination is legally correct or legally wrong. If the court agrees with the administrative decision, then the judicial inquiry ends and there is no need for further consideration of a possible conflict of interest. *See, e.g., HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co.*, 240 F.3d 986 (11th Cir. 2001). On the other hand, if the court concludes that the denial of benefits is legally wrong, then it must undergo further analysis of the decision.

**B.     Application of the Heightened Arbitrary and Capricious Standard of Review**

The court now turns to Hartford's decision to deny and/or discontinue long-term disability benefits to Plaintiff and reviews that determination on a *de novo* basis. "When conducting a review of an ERISA benefits denial under an arbitrary and capricious standard (sometimes used interchangeably with the abuse of discretion standard), the function of the court is to determine whether there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made." *Jett v. Blue Cross and Blue Shield of Ala.*, 890 F.2d 1137, 1139 (11th Cir 1989) (emphasis added) (citations omitted); *see also Richards v. Hartford Life & Accident Insurance Co.*, 153 Fed. Appx. 694, 697 n.1 (11th Cir. 2005) (finding no error in district court's refusal to consider social security award and physician affidavits generated many months after final benefits determination on the grounds that such evidence was not part of administrative record) (citing *Lee v. Blue Cross/Blue Shield of Ala.*, 10 F.3d 1547, 1550 (11th Cir.1994)).[3]

Moreover, a participant or beneficiary seeking benefits under the terms of an ERISA-governed plan bears the burden of establishing that he or she is entitled to such benefits. 29 U.S.C.

---

[3]Consistent with this controlling precedent, the court agrees with Hartford's argument in its Motion to Strike that Plaintiff's affidavit testimony notarized on April 19, 2006, which includes information about his current medical condition, is beyond the proper scope of review under ERISA. Accordingly, the court will enter an order granting Hartford's Motion to Strike. *See, e.g., Stidham v. Solutia, Inc.*, 215 F. Supp. 2d 1268, 1271 n.4 (N.D. Ala. 2002) ("In his brief, plaintiff refers to Exs. B, C, and D. This evidence was not submitted to the EBPC or made a part of the administrative record. Therefore, this evidence is not properly before the court.") (citation omitted); *Wilcox v. The Standard Ins. Co.*, 340 F. Supp. 2d 1266, 1282 (N.D. Ala. 2004) ("[T]his court, in applying the heightened arbitrary and capricious standard, is limited to the information before the plan administrator at the time the decision was made to terminate plaintiff's LTD benefits and through the administrative appeals process.").

§ 1121(a)(1)(B); *Farley v. Benefit Trust Life Ins. Co.*, 979 F.2d 653, 658 (11th Cir. 1992). Based on the terms and conditions of the Plan and Policy set forth above, this means that Plaintiff must demonstrate that he was "totally disabled" from performing any occupation, including his own occupation, after November 2002. Based upon the information in the record at the time of the administrator's decision, Plaintiff is unable to make such a showing.

Hartford based its determination that Plaintiff's condition does not meet the definition of total disability under the Policy upon the following pieces of record evidence: (1) Plaintiff was able to perform most activities within his restrictions and limitations of no repetitive stooping or bending and no lifting over 50 pounds (Doc. #19 at Ex. A at Ex.1 at 00474); (2) when he was first awarded disability benefits, Plaintiff was performing the "activities of daily living" unassisted and was continuing to engage in his hobbies of fishing and deer hunting; (3) after three weeks of physical therapy, Plaintiff was released from this program with a conclusion he could perform medium level work (*Id.* at 00161); (4) the only restrictions and limitations provided for Plaintiff related to his inability to lift or carry more than 50 pounds and limited stooping and bending, which was later clarified to signify no repetitive or continuous stooping or bending (*Id.* at 00159-60, 00362, 00379, 00489-90); and (5) the only clinical evidence provided during the entire claims review and appeal process was one 1999 MRI, which was conducted three years earlier than Plaintiff's condition in the fall of 2002.[4]

---

[4]As to this last point, Hartford notes that the lack of any contemporary clinical testing tends to support a finding of no disability. *See Ecklund v. Continental Casualty Co.*, 2005 U.S. Dist. LEXIS 40968, *54-55 (N.D. Ala. Aug. 25, 2005) (affirming insurer's denial of long-term disability benefits in part based on Plaintiff's inability to provide objective medical findings to support contention self-professed symptoms prevented her from performing her job).

Plaintiff's efforts to downplay this evidence (or to show that he is nevertheless disabled under the Policy) are unpersuasive. In support of his disability claim, Plaintiff primarily relies upon the vocational assessment conducted two years prior to the termination of Plaintiff's disability benefits by Vocational Consultant Jo H. Spradling (Doc. #19 at Ex. A at Ex.1 at 00151- 00154) and his favorable disability determination by the Social Security Administration.

As for the vocational assessment, which occurred in November 2000, its lack of temporal proximity to the ending of Plaintiff's benefits in November 2002 — a time elapse of two years — renders its findings of limited value. Moreover, the conclusions reached are inconsistent with those reached by Plaintiff's own treating physician and other medical providers earlier in the year. For example in November 2000, Ms. Spradling concludes, based upon a September 2000 FCE purportedly conducted by Dave Bledsoe,[5] that Plaintiff's 50% vocational loss (as determined from Plaintiff's medical condition in May 2000) translates into a 100% vocational loss given Plaintiff's inability to work consecutive days (or even daily) without the assistance of narcotic medication, along with his age, educational background, and work history. (Doc. #19 at Ex. A at Ex.1 at 00153-54). However, Dr. Pirofsky, in May 2000, issued Plaintiff only a 5% impairment rating, released him to return to work, and only recommended that he return to his clinic on an as-needed basis. (Doc. #19 at Ex. A at Ex.1 at 00159-60). Additionally, the accompanying discharge summary from Plaintiff's physical therapist's released him to perform medium level work. (*Id.* at 00161).

For several reasons, the Social Security Administration's favorable determination is not persuasive, much less controlling, as to Plaintiff's ERISA claim. First, the United States Supreme

---

[5]Hartford notes that the actual results of the September 2000 FCE do not appear in the record. (Doc. #18 ¶ 25).

Court has cautioned the lower courts about the marked differences between Social Security Administration determinations and those conducted in relation to ERISA plans. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832-33 (2003); *see also Whatley v. CNA Ins. Co.*, 189 F.3d 1310, 1314 n.8 (11th Cir. 1999); *Paramore v. Delta Air Lines, Inc.*, 129 F.3d 1446, 1452 n.5 (11th Cir. 1997) (clarifying that disability determinations under Social Security regulations, while subject to consideration, are not dispositive under ERISA-covered plans). Also, the relevant focus on time periods is distinguishable — the Social Security decision found Plaintiff to be disabled from the date of his on-the-job injury in November 1999, whereas Hartford's termination decision considered his continued disability status as of November 2002, three years later. Finally, the records before the Social Security Administration included records from several doctors and other medical providers that were not before Hartford so the evidence reviewed for each claim was significantly different,[6] which makes any attempt to draw a comparison of the two determinations even less helpful.

The employability analyses performed on Plaintiff also bolster Hartford's disability determination by showing Plaintiff has the ability to perform his own specific occupation of Section Foreman, a job that does not require repetitive stooping or bending or lifting or carrying more than 50 pounds. (Doc. #19 at Ex. A at Ex.1 at 00363-66). In fact, the second employability analysis conducted during the administrative process, identified at least four other positions in the light to medium work level that are in the same mining/quarrying industry as Plaintiff's work experience and would provide him the requisite earning potential under the Policy. (*Id.* at 00120-38). Finally, Dr. Hankins' assessment that Plaintiff's medication only results in "mildly troublesome" side effects

---

[6]Plaintiff's additional medical records under consideration before the Social Security Administration include those of Dr. Livingston, Dr. Craddock, and Dr. Lepke as well as emergency and outpatients records. (Doc. #18 at 23).

shows that neither his medicine nor his pain should affect Plaintiff's ability to perform previous work activities. (*Id.* at 00157-58). This assessment forecloses the contributing impact of pain as a totally disabling factor.

## V.    CONCLUSION[7]

For the reasons stated above, the court concludes that Hartford was legally correct in its decision that Plaintiff has not shown that he is totally disabled under the Policy and that its denial of Plaintiff's claim for benefits is due to be affirmed. The court will enter an order consistent with this Memorandum Opinion.

**DONE** and **ORDERED** this ____24th____ day of July, 2006.

                                    **R. DAVID PROCTOR**
                                    UNITED STATES DISTRICT JUDGE

---

[7]Because the court concludes that Hartford was *de novo* correct in its disability determination, it does not, consistent with Eleventh Circuit law, reach the potential conflict of interest analysis under the heightened arbitrary and capricious ERISA standard.